Publishing v. the NLRB. This is 24-27-88 and related case 24-30-57. Good afternoon, counsel. Good afternoon. Brian Hentos from Littler Mendelson along with my colleague Morgan Dahl on behalf of the Pittsburgh Post-Gazette. Respectfully request three minutes for rebuttal. Sure. In 2017, the Post-Gazette was losing millions of dollars each year and the news business was rapidly changing as advertisers and the public shunned the printed product and the world was moving towards a digital product. In short, we were a failing business. The company decided to make the entrepreneurial decision to transition from a seven-day print operation to an all-digital format. In bargaining, the company made bargaining proposals designed to enhance its chances of survival. In response, the guild told the company they were done making concessions. They encouraged the company to go ahead and sell the paper and then they said they would never agree to the company's health care proposal. We move to the impasse issue first. How much weight do we give these business decisions that the newspaper was making? Well, your honor, I think that's one of the key questions in this case because really what the board here is attempting to do is to dictate to a business that's failing. We lost $18 billion, $19 billion in 2016 before this bargaining started. It is dictating the type of proposals we can make to the union and here's kind of the key fact in this case that distinguishes it from anything else. The proposals that the Post-Gazette made were not designed to undermine the union in any way. We didn't take any stab at hitting into union security, into the payment of union dues, into the arbitration and grievance provision. All of our proposals dealt with the actual operation of the company, how layoffs will occur, how subcontracting will occur, how the health care will be paid for. Obviously, if you're losing $19 million a year, you're going to look for some economic ways to save some money and stay afloat. All of our proposals in this case, none of it's to undermine the union. Everything is about being able to operate in a new world. In 2017, the Post-Gazette's a fully printed product. Now we're moving to the digital world. We don't know exactly how it's going to work itself out, but we know with respect to some proposals, we need the discretion to be able to react to what the world's going to do. We couldn't guarantee 40 hours a week to employees. We didn't know we were going to print the paper for five days a week. Even in the digital world, we may have to cut back on the amount of digital days. So how can we guarantee 40 hours a week, your honor, if we didn't know we were actually going to be working? With respect to the impasse, what the boards and the court has told us to do is look to the contemporaneous understanding of the parties. And so let me kind of just put this in the best I can. We bargained for three and a half years, 24 bargaining sessions. In the 10 months leading up to the impasse declaration, they offered to bargain one time with us. Then we get a letter from union council that says, negotiations are terminated. And he says the magic words. He says, they're worthless and fruitless. Now, fortunately, we have the benefit of there previously being a 10-J proceeding, which Judge Bassoon, Western District of PA, looked at this. She looked at that letter and said- That was with a different union. The guild at one time was a party to that, your honor. The decision does not affect this union. The letter was referenced. The letter that I'm speaking of was sent on behalf of the guild and all of those production units. The finding is not something for us to review here. That would be a different standard of review. But we're bound by a totally different standard of review here. So her decision is not something we're reviewing, nor is it relevant. Actually, your honor, in the new concepts decision from this circuit, they said, if there is another fact finder that had looked at this, that is something relevant to be considered by the court. So getting back to the impasse, they make the statement worthless and fruitless. If you look at every impasse case, that's really the question. Is continued negotiations worthless or fruitless? They told us it was. Then, in keeping with that, we next send them a position statement, responding in full to their September offer and laying out exactly what the company's position was. They ignored it. And that's consistent. If I had said, look, I'm done with you, I'm done bargaining, why would I respond to that? Then we send them a final offer. They ignore that. Again, consistent with them saying, we're done. We're at an impasse. Then in response to us saying we were going to implement, they don't offer a new proposal. They say, well, we'll sit down and bargain with you and we'll suggest changes to your final offer. They don't do what would be needed to break the impasse, which is to come in and say, well, here's how our proposal has changed. Here's what we're going to do. They don't do any of that. They say, look, we'll sit down with you. We'll tell you what's wrong with your offer. Can you explain a little more your argument that you made in briefing that the fact that the implemented terms were not a reflection that PG had room to move. Rather, it was a reflection that PG was conforming with law. Can you expound on that a little? Yes, I'm happy to. Under the McClatchy newspaper line of cases, and it went back and forth like a ping pong ball in that case, they basically said, look, you cannot implement discretionary proposals. What the Post Gazette did, and being as conservative as possible under the law, we said, look, we're not going to implement any of our discretionary proposals. This was not a new proposal. The proposals with discretion remained on the table. We were just prohibited from actually implementing those proposals under the law. And so that's why we did it. But the board tries to shift that to say, look, you made a new proposal with the implemented terms. No, we didn't. We didn't make a new proposal. The proposals remained the same. We just needed to make sure we weren't implementing something that was unlawful. But did it nonetheless reflect that you had room to move since you were willing to implement terms that were different than those proposals? No, Your Honor, because the discretionary terms remained in our final offer. That is, the proposals that are on the table right now are the ones with discretion. Our opinion was, under the law, we would be prohibited from implementing any of those discretionary terms. So it's not that we had room to move. We simply had to comply with the law. And so you wouldn't say that the implemented terms were bargained for? They were not, Your Honor. They were an operation of law. This was the most that we could actually implement under the law. So I would respectfully say, if this is an impasse, I honestly don't know if we could ever have an impasse in bargaining. It's so crystal clear by the union's own words that we were at the end of the rope. Now, moving along to the bad— Could you address their argument that their words express their already stated position, per complaints to the MLRB, that PG was in bad faith? In other words, that the worthless, these are worthless, nothing's happening, reflected that another way of saying PG continues to operate in bad faith. In my mind, Your Honor, Guild Counsel is an experienced labor attorney. I would take his words for exactly what they mean. This is somebody who understands, if you're going to use these buzzwords, and in our world, it's a small one, I know, but in our world, if you were to use these words, that signifies to the other party, we're done. We're at the end of our rope. And so them expressing their position, there's nothing in that letter that talks about bad faith bargaining or charges or anything like that. It's the unilateral termination of bargaining and then saying, oh, and by the way, it's worthless and fruitless. Now, moving to the bad faith bargaining. So this case is about bargaining proposals and nothing more. They can't point to any evidence in this case besides the proposals themselves of any bad faith bargaining on the part of the company. And again, just like the impasse, for us to understand and judge these proposals, we need to look at it in the context in which they were given. We're hemorrhaging money. We are a failing business. We need to figure out the only way we can to survive. And from that, really what the government's doing here in this case is saying, no, you all don't get to decide as a business what you think you need to do to survive. We get to decide. But do you think the NLRB or the ALJ in this case just completely disregarded these business concerns? Yes. I think there was zero respect given for the business decision. They looked at it and said, yeah, you know what? The Post-Gazette's losing money. We don't care. We still find these proposals offensive. And again, getting back to the proposals themselves, the work hours, we simply can't guarantee anything. The subcontracting, we had done subcontracting in the past. It is common in the newspaper business that you will rely on sources from other conduct, from other providers. For instance, today dealing with this horrible tragedy down in Texas with the Pittsburgh Post-Gazette reporter down to Texas to report on that because they don't have the connections. They don't understand the community. Of course, we're going to rely on somebody from Texas who understands that community, the heartbreak, to be able to tell that story. They're going to do a better job at it. I see your yellow lights on, and I just wanted to ask you, did you forfeit your argument regarding the Thrive remedy? I don't believe we did, Your Honor, because from the beginning, even in response to the administrative complaint, we had affirmative defenses that dealt with the issue of remedies being sought by the labor board. And in addition to that, this court's decision in Starbucks directly addressed that issue and said, look, there's no consequential damages in the labor world. But you could have made the argument before that this is a law that provides equitable remedies, not damages, same as Starbucks did, but you didn't. Still, in this circuit, Your Honor, the law is, the board does not have the power to award this type of equitable remedy. Right, that's the law now, but did you preserve that is my question. We believe we did. Okay, so how did you preserve that? We spoke directly about the remedies in our response to the administrative complaint, the answer itself, and then also in the exceptions that we thought that the proposed remedies... You said those remedies are not supported by or available under the facts and or the laws they apply. You didn't say anything about thrive or non-compensatory or beyond equitable jurisdiction, anything like that. Yes, Your Honor, so in the new concepts case, Judge Smith in the majority opinion and then Judge Krause, I believe, in the concurrence, really goes into a lot of detail as to what it means to preserve an argument under 10e. But the board's position is I need to tell you verbatim exactly what I intend to argue. Okay, and most circuits, the 6th, sorry, the D.C. 2nd, 6th, 7th, and 9th hold the intervening case law is not an extraordinary circumstance. I think if you were to look at, there's also a 5th Circuit case that came out in addition to new concepts that says, look, you don't have to use any type of magic words to properly preserve. All you have to do is put the board on notice that you briefly, Your Honor, I don't want to use a prop, but their evidence of surveillance is if I were to hold my phone up and then you say, maybe you took a picture of me, maybe you didn't. Well, they did take pictures here. They didn't. There's no, the only pictures that were taken were taken by the guild members photographing the security personnel. They have no evidence that the security personnel took any type of photograph. I mean, there are pictures and evidence of someone going, two pictures of someone going like this. There is one like this, as you stated, but someone going like this. How is that not substantial evidence? Just as easily, Your Honor, that individual could have been watching a video. We have no... Substantial evidence is a very low standard. It is. I would say this with respect to the surveillance issue, that happened months after the implementation that occurred here. It's somewhat, in my mind, it's irrelevant to the bad after. That was one isolated incident. But you're contesting, the reason we're asking is that's part of your petition. It is. Yeah, I would say that they lack substantial evidence because they have no way, they failed to prove that the individual, the security guard, took a photograph. And in addition to that, if he took a photograph, it's undenied that it was not done at the behest of anybody at the Post-Gazette. Assembly member, thanks. Good afternoon, Mr. Heller. Good afternoon. May it please the Court, Joel Heller, the National Labor Relations Board. Your Honors, this case involves the functioning of the collective bargaining process, which is an area within the heartland of the Board's expertise. Substantial evidence supports the Board's finding that the Post-Gazette breached its duty to bargain in good faith, and they imposed new working conditions at a time when negotiations were ongoing. Let me ask you about these business concerns. Sure. Do we bake that into the equation or not? Or should the ALJ and the NLRB take it into consideration, hey, we're about to go out of business. We lost $19 million. We're in a bad place. So the Board would consider if the employer offered explanations for its proposals. And the Board did consider that. And they said, okay, you offered some explanations. So it's not that it was just you threw it out there and you didn't give any reasons. So the ALJ put that aside. They say that's not the basis. That kind of no explanations for your proposal. Put that aside. But then they went on to say that the other factors to go towards bad faith bargaining outweighed the fact that the Post-Gazette gave an explanation. But let's talk for a second about that explanation so that we don't deny that this is a tough time for the newspaper industry. But keep in mind who the employees are in this case. It's the editorial staff. These are the content creators, the folks who write the articles. And so they're going to be working, regardless of whether it's a digital publication or a print publication. It's not the people who fix or run the printing presses. And look at the proposals that the Post-Gazette was insisting upon all this time at which they are irrigating for themselves this kind of complete discretion for unilateral control. They're not all impacted by this switch over to a digital landscape. The healthcare, for example. Why would it matter what kind of healthcare employees have? Or why would whether they're writing on the digital format or the print format impact what kind of healthcare they have? And so the kind of top level, yes, there's a story to be told about the newspaper industry in this country. But that's not the story that is kind of, that doesn't tell the whole story of this particular case. And whether parties bargain in good faith is a fact-intensive inquiry. It's for the board in the first instance. The Supreme Court has said that multiple times. The board has the primary responsibility of marking out the scope of the statutory duty to bargain, for example. It's the substantial evidence. The Post-Gazette insisted on introducing and locking in unilateral employer control over a wide swath of working conditions, hours, healthcare, sick leave, layoff and recall, work allocation, subcontracting. And the cumulative impact of those proposals is that it would effectively strip the union of its representational role. But was it just the fact that those were the proposals or the continued adherence or both? It's both. And, and. It's both and. The board was not looking at this proposal and saying, that's just too much. You can't do that. That's kind of American national insurance. They rely on that case. They said this management rights clause, you can't say that is per se illegal. That's not what was going on here. So even if they had started with just all of those proposals, that wouldn't have been enough? I don't think so. If we had one bargaining session and they said, here's, here's it. I don't, we wouldn't be here. You look at the context. You look at, yes, the insistence upon those proposals. You look at the cumulative impact. You look at the type of issues that the proposals were addressing. Again, American national insurance was a management rights clause. This is all sorts of things. The Post-Gazette introduced a man, proposed a management rights clause. And that was not the basis for the board's decision of bad faith bargaining here. In the D.C. Circuit's decision in McClatchy Newspapers, they talk, and this is a different section that you were talking about earlier. The court warned against what it called overreading American national insurance. And it pointed out how that was a management rights clause. And they said, we doubt that if a company came forward and said, we are retaining unilateral control over pay, the D.C. Circuit says, we doubt that that would be rendered unassailable by American national insurance. And so look at the types of the subject matter covered by the proposals here, where the Post-Gazette was retaining unilateral control. So what does the remedy to return to good faith bargaining mean? If they're allowed to start off with all of those proposals and they're not required to concede any proposal, then if we were to say, we grant your petition for enforcement, what would that mean? They would go back to the bargaining table. And they can still have all those proposals, but they wouldn't have to concede any of those proposals. So at this point, of course, there's lots of water under the bridge. So it's not the scenario where they just come forward and that's their first proposal. So we would have to look at, the history would still be there. We would have to look if anything was given in exchange, because bargaining is a dynamic process. It's a back and forth. So you look at whether there were concessions the Post-Gazette made in exchange for taking all of this unilateral control for itself. And the board found that there wasn't. I mean, they talk about this wage increase. I think the union explains it in its brief and detail how that works with the math of it, how it's not actually much of an increase at all. Another thing to think about is in some of these cases, the court finds or the board or courts find that the grant of a grievance arbitration provision in the contract, that can be a quid pro quo for something like a no-strike clause. Union's giving up something in exchange for the grievance arbitration. But the employees in this case already had grievance arbitration. That was in the existing collective bargaining agreement. So it's not something new they were getting in exchange for giving up the union's control. There was no quid for the quo, so to speak. Again, this is, you look at, again, this is going back to the kind of newspaper industry story. In a unionized workplace, the way you deal with changes in the landscape is through bargaining. So the Post-Gazette may think that the best way to deal with the state of journalism today is to take on more discretionary authority for itself. But its employees and their union might have other ideas. And those come out through the bargaining process. And the reason why this degree of discretion is important to the bad faith analysis here is because unilateral control is kind of the antithesis of bargaining. Bargaining is by its nature bilateral. And so if one party has the authority to make all the decisions by itself, that's just not what bargaining is. And so it's, again, it's this idea of stripping the union of its authority, or sorry, of its representational role in a way that leaves the employees with fewer rights than they would in the absence of a contract. Because in the absence of a contract limiting the union's ability to negotiate, the union would be able to represent the employees and negotiate on these matters. Can you address their other point about McClatchy? Yes. So this goes to the impasse issue. And if I may make one prefatory point, if you agree with us that there was bad faith bargaining, we necessarily win on the impasse violation, because there can't be an impasse when parties are not bargaining in good faith. But yes, the McClatchy point. So the fact that their imposed proposals gave up some of this discretion that they were hoping to get, that shows that they were willing to live, they were willing to forgo that degree of discretion in order to get the other aspects of their proposals that they wanted. And they say that we got to that point because of operation of law, because of McClatchy. But it also shows that they could have gotten to that same point through bargaining. And so it shows that this was a possible outcome, that the employer could have lived without that degree of discretion, which would have shown movement, which would have kept bargaining going on. A couple of factual points, if I may, on the impasse point. So the Post-Gazette was talking about how there was this long stretch where there was only one bargaining session. And that's because neither party actually had reached out to the other between, I believe there was a September bargaining session, and then neither party reached out to the other until January. So that delay, that gap can't be put solely on the union. What do you think of Counsel's argument with respect to this letter that he received, telling him that discussions would be worthless? Sure. Well, so that letter was sent in, I believe, around March 20th, 2020. If you remember, there was a lot going on then. That letter was about COVID. It's saying we're going to cancel our current bargaining session, and we're not going to hold bargaining sessions because of the COVID pandemic. And the Post-Gazette didn't object to that. Actually, the Post-Gazette did the same thing with the other unions it was negotiating with. They say, we're going to call off bargaining until we're let out of lockdown or something like that. And so, yes, at the end, I believe, there's a two-page letter. Near the end of that letter, the Unions Council did talk about, we're not going to continue, and I'm paraphrasing here, but letters on the record, we're not going to continue these fruitless, we're not going to put ourselves at risk to continue these fruitless negotiations. So it was, again, in the context of a pause for COVID. Frustration is not the same as impasse. The Union Council was clearly frustrated, but this was perhaps because he was going up against, again and again, the bad faith bargaining of the Post-Gazette. And again, you have to look at the context. This was in late March. Maybe people weren't on their best behavior when everyone was freaking out about COVID. If I understood you correctly, we find bad faith, you win on impasse. That's correct. That's correct, because there can't be a declaration of impasse if the party is bargaining in bad faith. But it could reflect one of the impasse factors, which is the party's perception of whether, the last factor, the party's perception of where bargaining is. And so if the Union, the Guild says these have been fruitless, can't that be considered as to that factor? Yes. I mean, I think I've explained why in this context, it wasn't evidence because it was in this COVID letter. But I think even, okay, if I understand the question then, if there was the finding of bad faith, then that ends the inquiry. Then it doesn't matter if there is this other So say that the Union's letter actually did say, this is worthless, nothing about COVID. At that point, if the Post-Gazette had been bargaining in bad faith, they still couldn't declare impasse. Yes. Another factual point on impasse, the letter that the Union sent in late July didn't say, the only way we're going to bargain is if you change your proposals. It's a JA-1446, this He says, we stand ready, willing, and able to meet and go through our last proposal and your final offer and make suggested changes in an attempt to reach mutual agreement. Please advise us to your available dates so we may reach a mutually agreeable time. That imagines back and forth, not just a one-way street. Running out of time, just quickly on the surveillance point, the violation that that board found was creating the impression of surveillance. It wasn't surveillance, so it doesn't actually matter whether someone actually took a photograph or not. The question is whether there was an impression of surveillance, which is an objective standard. I see I'm out of time, so thank you. Thank you. Is it Sharma? That's right. Good afternoon, Mr. Sharma. Thank you, your honors. Manish Sharma for Intervener Union. Just a few quick points in my limited time. The first, as it relates to the money, the company has made the claim that it was losing $19 million. The Union asked for them to show us their books to prove that, and they refused to do that. So we can only take that for what it's worth. And the argument that the company was losing money, therefore it could sort of bargain for whatever it wants, seems to be an argument that collective bargaining and a company that's struggling can't coexist. And that's absolutely not true. It's not the history of collective bargaining. Collective bargaining can solve these problems. So I don't think that that's a reason to allow the company to do what it did. I will say on the bad faith bargaining, there was three things that the board relied on. One, the proposals that were advanced. Two, the adherence to the proposals. That's the fact that they kept at those proposals from beginning to almost the end. And then three, that there was no economic incentives that were provided in exchange for the discretion that they were asking for. That's at J8, 68, and 69. And the idea there is that the company was asking for discretion in a way that if there's no contract at all, the Union would be better off with no contract. And so the board was looking at that and then looking to see, well, were they trying to buy this discretion from the Union by giving some economic incentives? And no. Then it begs the question of how would the Union ever agree to that? They're better off with no contract, which leads to the board reasonably drawing an inference that in that situation, the company didn't have an interest in actually reaching an agreement, but preferred to reach an impasse. On the impasse, just very quickly, there are two points I want to make. So on the McClatchy point, my friend characterizes what the board did as though when the company implemented the more favorable terms, that they were creating a new proposal. It's not what the board at all was saying. What the board was saying is that it showed that there was distance between the proposals that had on the table and what they were willing to live with. And they've now lived with those implemented terms that don't have the discretion that they were seeking at the table for five years, which is longer than any contract that they would have bargained with the Union. And as far as the words worthless and fruitless, to the point that Judge Chung was making in context, it reads, this is at JA 1290, simply going through the worthless notions that for three plus years have the employer has no intention of reaching an amicable resolution of the CBA. It was driven by the frustration related to the bad faith bargaining and the bad faith bargaining conduct up to that point. And if there was any unclarity about what the Union meant, the letters they sent on June 22nd, July 14th, and July 20th show that the Union was ready and willing to bargain. Thank you. Your Honor, the board finally in one of their recent filings said, look, it's not that we're not arguing each proposal itself is per se unlawful, it's this combination. Now the problem with that is American National and Struthers say, look, you're allowed proposals with discretion. In Struthers, there were three separate proposals all dealing with discretion. Also in the new concepts case, the recent decision by the Third Circuit that said, look, no bad faith bargaining when there was a wage freeze, elimination of the checkoff in Union security and arbitration. So this whole idea of a combination, courts have expressly said, look, you could have multiple discretionary proposals. There's nothing wrong with that. And it begs the question, what is this standard? Who gets to decide what combination is acceptable? What is not? Can I get two? Can I get 10? Is it somewhere in the middle? And more importantly, and really what it probably is, is they get to decide every time. They get to decide whether or not the combination is right. Counsel for the board had an interesting comment also. He said, well, we'd have to look at the concessions that are made for the proposals that the Post-Cassette's advancing. H.K. Porter talked about this. Struthers talked about this. They don't have the authority to do that. They don't have the authority to sit in judgment of our proposals. And they certainly don't do it when the company's fighting to stay alive. And they're going to sit there and say, you know what? In my opinion, that's just not good enough. Now, a few other points. Opening the books. We offered to open the books to these guys way back in 2018. We said, here, come on, take a look at the books. They said no. And the reason is they knew what they looked like. One final point. The letter concerning the termination of bargaining. They say, well, the company didn't object to that. We did object. We fought an unfair labor practice charge against the union. That's the only thing we could do. So we certainly did object. And the other thing here is this wasn't simply saying, hey, look, you know, COVID's going on. We need to come up. We've got to put these negotiations on hold. It went way, way further than that. And board law is crystal clear. The COVID-19 pandemic has nothing to do with your obligations under the act. You still need to find a way to meet the bargain. Finally, the last point I'll make, the issue of them saying, well, they made a proposal about health care. Of course we made a proposal about health care. Participation in the fund was requiring 100 percent payment by the Post-Gazette. Again, we're losing $19 million a year. We need to find some way to save money. Under the Post-Gazette's plan, there was different tiers. With the fund, there was only one tier. And then ultimately, we could have some control over keeping costs in line as opposed to what we with the fund. If you don't have any other questions, I'll see them. Thank you. So, folks, we're going to take a five-minute recess before we hear the contempt arguments. And that'll be the NLRB will go first in that scenario. Thanks. So, we will recall this case in the context of the pending contempt motion. We'll hear from Mr. Smith. Let me just get right to it. What do you want us to do? We would like you to grant our motion for contempt and... Be a little more specific. Yeah. I'm getting there. We want fines for noncompliance with this court's order. What we really want is for them to comply with the order. And so, we want them to put the employees back in the health care they should have been receiving before the Post-Gazette made its unilateral changes to their health plan. So, restore the status quo on the health plan? Yes. And status quo as of 2017, as of 2020? Yes. So, the status quo, we want restore as to what the employees should have been receiving in July 2020. And what that means is, because there's some fight about what the deductible level should be. And the point is, and there's a lot of background here, so I'm going to try to explain this as pithily as possible. The employees should have been receiving the lower deductible plan in July of 2020, at the time the Post-Gazette made its unlawful unilateral change. Per the binding arbitration? Per the arbitration, yes. Okay. So, just let me ask you, what was the state... What is the state now? Are they getting the high mark, PPO blue, retail clinic visits, 100% after... Is it largely compliant with Exhibit B, but for the deductibles? You mean currently? Yeah. Currently, they're on the company's plan. Okay. They're not on the union's plan. Right. But the company plan could be a high mark PPO blue. So, I guess what I'm asking is, other than the deductible, is it largely... It doesn't have to be provided through the fund, correct? It just has to be the same as what's in Exhibit B. Well, that's an interesting point. I hadn't thought about that. I think one of them... And I'll admit, I don't know the kind of substance of the different plans, but under the company's plan, it's a 70-30 premium split, that the employees have to pay 30% of the premiums. Under the fund, under the plan they had before, they were not... The company was covering the premiums. Right. And so, that's a difference. The deductible is the difference. As far as the content of the plans, I'll admit I don't know the differences between the two. I'm just trying to understand what is not clear as far as the order that was entered in February. Well, we think it's plenty clear. Okay. So, for my sake then, for the arbitrator's decision, per the terms of the CBA, the Post Gazette only had to pay 5% increases each year. The arbitrator's decision seems to imply, it could be read, that the Post Gazette pays increases no matter what those are. Yes. So, the 5% number was for particular years that was set forth in the CBA. It said for 2016, 17, I think, the company pays up to a 5% increase. But that was specific to those years. I believe the arbitrator says going forward, the company pays all of it. So, the status quo on July 26, 2020 is that Post Gazette pays for all increases even over 5%. Yes. Per the arbitration decision that this court enforced. All right. And I asked you this last time, who is covered? Because now you have, I think, at the time, there were 73 unit members, 27 on strike. So, per the CBA, you only are covered if you are working 30 hours per week. Yes. So, if those are the terms and conditions on July 26, 2020, what does that mean today? So, is the question whether the striking employees need to be put back in the fund? Yes. That, if I may punt, I think that's a question for the intervener counsel in this case, who has kind of a better knowledge of what's going on in the ground. But yes, our position is what needs to be restored is what the employees should have been, the terms and conditions, because that's the language of this court's order, the terms and conditions of the employees as to their health care that should have been in place in 2020. So, the focus is on the terms and conditions. Right. The employees. So, it's not on what the employer has to do to get them in that position. So, if the employer is paying, the Post Gazette is paying more now than they were in 2020 to get employees to restore those terms and conditions of employment, that doesn't matter. We believe this court's order says is that if you focus at the terms and conditions of employment, that's what needs to be restored. So, if they have to pay the higher amount to get the lower deductibles or if they have to be bound by a trust agreement, assuming that wasn't the case back in 2020, it doesn't matter. The focus is on the terms and conditions of employment and that's what needs to be restored. Mr. Heller. So, your friends on the other side argue in July 2020, the arbitrator's decision wasn't going to be enforceable for seven more months. So, the relevant status quo was what they were actually providing right before impasse, the inferior plan with the higher deductible. What do you say in response to that argument? So, the arbitration award issued in December 2019. So, this was seven months before the change here. And so, yes, there was ongoing litigation. They sought to vacate the arbitration award, but the arbitration award itself had already issued. So, that is, and that was subsequently affirmed by the district court and by this court. So, we think that even though that litigation had not played out yet. But it wasn't enforceable yet. It had not been enforced yet. Yes. Okay. That is correct. But we believe that they were still, what they should have been doing is what the arbitrator said they should have been doing as subsequently enforced by the court. Okay. As subsequently enforced. But they're saying the status quo empty is what was enforceable as of that time. So, does it matter that it was still pending review by the district court and the court of appeals? I don't think so. I mean, I guess we would be in trouble if this court had later vacated the arbitration award. But I think, so our position is, yes, they should have been abiding by the arbitration award. And they were abiding by some certain aspects of the award, I believe. The intervener can correct me if I'm wrong there. I'm sure the company can correct me if I'm wrong there. Yes. And that is, so I think you can take comfort in our position because the court later did actually enforce that. So, we're not asking you to do something that that is, this court has found contrary to law. And of course that, right, the post-exec can't use these proceedings to collaterally attack the arbitration award. That litigation is through, is finished. Also, the fact that, right, that they don't like some of these, what they call the new different costs or the trust agreement. But that doesn't mean it's impossible for them to do so. And it is their burden to prove an impossibility defense to a contempt finding they haven't done so. Who would enforce this? Sorry, who would enforce this? Who would enforce this contempt order? Let's assume we find they're in contempt and we order X, Y, and Z. Do we enforce that? Do we proctor that? Do we send it to the district court? Who enforces this? I believe that this court would enforce. This court? Yeah. We would come back if we believe that they are not in compliance. We would come back and request. Wouldn't that require some evidence? Sorry? Wouldn't that require some evidence? I'm not sure what evidence, whether they have complied. I mean, I think that's going to be a binary yes or no question. They've either put them back on the plan or not. So that's their only choice right now? Yes. Put them back in the plan as we've described it today. I apologize. I didn't notice. This is my, if I even into my rebuttal time, I think I have. No, no, you're still good. I'm okay. I did not reserve. How much time do you want for rebuttal? Let's do two minutes. All right. Appreciate it. You have a minute and then get two minutes later. Okay. Got it. Thank you. I'm not used to going first in these proceedings. Board is always second. Right. They talk about this trust agreement. Let me get back to that in a second. Just a top level point. A contempt finding is particularly important in this case because we're dealing with an injunction. So this court has already recognized the need for swift action in this case. And so that's why compliance with the injunction order is particularly warranted here. And then I guess I'll go to that one point about the trust agreement. They say that they would have been, sorry. They say it's a new requirement as of 2022. Assuming that's true, they would have been subject to that same agreement, but for unlawfully kicking the employees out of the final plan. So I don't think they can complain that this is some kind of new being required to do that they wouldn't otherwise have had to do because they would have had to do that. I will return. Thank you. Thank you. Thank you, your honors. I think I wanted to try to address some of the questions. So as far as the difference between the plans, they're significantly different. Under this, the plan that's imposed, the employees premium share is for a family. It's about $8,500 a year. An employee plus one is about $5,500. For a single person, it's about $2,700 a year. That would be zero under the fund. Instead, they had 8% deferral back then to help offset some but that actual out-of-pocket for the premiums that the employees paid was zero. The deductibles are significantly different. So there's a large difference between the fund and the current plan. That's what they pay. What about the scope of the plan? I'm not sure. I haven't compared the networks. Okay. You don't know that. Yeah. Yeah. I will say, so the company's argument about that somehow doesn't mean to go back to the fund. In their own filing, this is in their response brief to the TENI motion. This is document 26-1. They say rescinding the implementation would require a return to the fund. So they knew what rescind meant. They knew what it meant then. They know what it means now. For them to say they're confused about it. In fact, they even published an article in their own newspaper about the TENI saying it requires restoring the insurance coverage in effect in 2020. So they're well aware of what that means. As far as their argument about the trust agreement, that somehow that changes the status quo, that's a total red herring. And the reason for that is that the federal courts, the uniform position of the federal courts has been that participation in a Taft-Hartley fund binds you to the terms of the trust agreement regardless of whether you've signed a trust agreement or a participation agreement. I'll give you a citation for that. That's Wise Foods versus UFCW Health and Welfare Fund. That's 2021 Westlaw 1253546. That's an Eastern District of Pennsylvania decision from Judge Goldberg in which he collects cases to that effect. Thank you. Thank you, counsel. Judge Chung, in response to your question, the non-striking employees are currently covered by Blue Cross Blue Shield plan. And are the terms of that, other than the deductible on the 30%, are they the same as Exhibit B? Exhibit B from the collective argument? I'm sorry. It's what we would call a 70-30 plan. Beyond that, I honestly cannot rely on it. Okay. No one knows if the scope is the same. Yes, Your Honor. Okay. And can you answer the question, when you were here in February, or actually I guess we were in Pittsburgh, but your position was when I asked that all unit members would be covered, is that still your position? The CBA says whoever is working 30 hours or more. Who is covered by a rescission? I believe it would still be the 30 hours or more. The plan is offered to those employees. About 2,600 people are covered by this plan, Your Honor. But as to the guild itself? The guild would be covered by the company plan. No, I'm sorry. I'm asking if the terms are rescinded and the status quo, whether it be on July 26th or per the binding arbitration, who would get coverage? Would the striking employees? Would all 73? Who all would be your position? Who is affected by that? Your Honor, the board law is clear that striking employees are not entitled to health insurance. Is it still 73? Roughly, Your Honor. Those are the individuals who would be entitled to any form of insurance because they're the only ones working. And your impossibility argument is related to the participation agreement. I did not see you make an argument about cost, that you couldn't afford it. You've talked a lot about not affording things, but you didn't make that as an impossibility argument. Your Honor, the fund has refused to give us the pricing information. So here's what we've done, Your Honor. So since the order came down, we've attempted to bargain with the union. We've attempted to negotiate with the fund to figure out a way to get this where we would re-enter the fund under the status quo that was in place in July of 2020. That was no participation agreement and a different plan that was in under the terms of the CBA. So we have said to the fund, look, please provide us with the information for the plan that was in effect in July of 2020. And we've also said, look, in the past, we've never been subject to a participation agreement. We proposed to the fund language that would say we would pay the money into the fund. In exchange, the employees would get the health insurance, but we would be exempted from that participation agreement. The fund said, absolutely not. I understand. I'm asking you about you're not making a cost impossibility argument. There's a gigantic cost difference, Your Honor. So under the terms of the expired CBA, it was a $1,350 per month contribution from the company into the fund. Now we are in a 70-30 plan with respect to the company's plan. So the costs are less. The participation agreement is really a key, Your Honor. If we were subject to the participation agreement, then we could be on the hook for auditing fees, exit fees. The fund would have unilateral control in order to raise costs at any time. And even if we're ultimately successful in this litigation, we would have still been now subject to that participation agreement with the fund. But is that impossible for you? I'm just asking. I'm trying to understand your impossibility argument, which I understand that participation agreement could cause you, there's a possibility it could cause you to incur additional funds. But is there a separate cost? So for instance, if I were to calculate the cost of this plan, Exhibit B's plan, at a 5% increase from the last time in the record I have a price, it'd be about $55,000 per month for the 27 striking, or for 73 people, about $180,000 per month. Maybe that's wrong. Maybe you're going to tell me industry figures are it's risen 10% every year, or they've told us it's now. I'm just trying to understand if you actually had to pay that, is that impossible? Is that part of your impossibility argument? Your Honor, we'd be happy to submit a supplemental response laying out what the cost differences are based on what we would think. But are you saying it's impossible for you? I'm just trying to understand, what is your impossibility argument? Is it solely the participation, or are you saying we actually cannot afford to pay for this? No, the impossibility argument, Your Honor, is that the fund will not allow us back in under the status quo ante that was in place in July of 2020. But they just sent a letter saying you don't have to sign a trust. Your Honor, they sent that letter because their trust agreement states, look, if you participate in any way with the fund, you're subject to our participation agreement. So they're right. They don't need us to sign an agreement because the sheer participation in the fund is the ascent. And by participating in the fund, we were then bound by it. So why is that impossible? If you're bound by it, why is that impossible? Because, Your Honor, we were not bound by that agreement in July of 2020. We've never been bound by that agreement. It's a fundamental change. And when counsel says, look, if they wouldn't have taken the folks out of the fund, they would have been subject to that agreement. That's not true. We had certain units, not the guild, but units that were participating in the fund after 2020, and we were not bound by the trust agreement with respect to that. This is a high-mark PPO plan. Why do you have to get it through the fund? Why don't you just get it through the company? Your Honor, because the board's position is that we need to get it through the fund. I didn't hear the board just say that. In the correspondence we have received from them, Your Honor, their position was you need to go back into the fund. They did not care about the participation agreement. And they're saying you need to go back in under the terms of the 2017 CBA as opposed to what was in effect right now. So we have made efforts to attempt to comply, Your Honor. The fund has told us they won't give us the rates for what was actually in effect, and they've said too bad on the participation agreement. We don't care. And truthfully, Your Honor, that's one of the interesting facets of this case. The fund is a third party. They're purposely within their rights to insist upon something. And if you go back, the board's order says nothing about restore. The board's motion to this court says nothing about restore. And it kind of makes sense in a way, because somebody at the board presumably said, well, we don't know if they can actually restore the status quo. We don't know if the fund will take them. And that's the interesting thing here about this order, Your Honor. It says bargain and rescind, which we've offered to do, of course. There's nothing in the order that says you need to restore coverage through the fund. Now, the other issue with the participation agreement, Your Honor, is I think it raises some very serious constitutional concerns as to whether or not the board can force us as an employer to agree to a contractual relationship with a third party. You're the fund. And that's what they're asking us to do today, Your Honor. They're saying, look, you need to be bound by that agreement. We don't care that you weren't in the past. Now you need to be bound. Well, Your Honor, they're demanding that we submit to a contractual relationship with a third party. And that raises serious constitutional concerns. The Supreme Court has said, look, you cannot be compelled to agree to a bargaining proposal. That is what they were asking us to do here. Oh, I'm sorry. So I believe, in a lot of ways, Your Honor, the order is unclear with respect to whether or not it requires restoration, because the board's order itself doesn't say restoration. Their motion never said restore. So I believe we've complied substantially. We've offered to bargain. We've offered, we actually offered to bargain with the union over three things, the effects of the order, strike settlement, and contracting. They said no thank you to the effects bargaining. They said no thank you to our strike settlement negotiations. Then we've done things to get coverage through the fund in an attempt to comply. We provided the census information to the union that they requested. They, in turn, provided that information to the fund. We've had correspondence with the fund. They just simply refused to give us the plan that was in effect, and they refused to move on the their plan. If they want to insist on a participation agreement, that's fine, but that's not the status quo ante. We were never subject to a participation agreement. And, Your Honor, with that participation agreement, really, there are a new set of responsibilities that the Post-Gazette had never been subject to before. And, you know, it would do a fundamental unfairness to the company if we were to say, look, now you're stuck with exit fees. Now you're stuck with accounting fees, auditing, being subject to liquidated damages if they think we violated the agreement. Now, finally, counsel had said, oh, there's case law out there that deals with an employer being subject to the terms of the trust agreement. That's not accurate. Now, the fund always had the right under ERISA to come after us if we did not pay them the money called for by the collective bargaining agreement itself. So that's, they always had the right to sue us for that. Now, this is a whole new agreement that the Board is demanding we enter into where we were bound by all of these other facts, or bound by all these other clauses that are in effect. Now, finally, going back to the arbitration award, that was entered into and did not become effective until this Court ruled in 2021. So that was not in effect in 2020. One thing the Board did not tell you about here today. After the contract expired, the Post-Gazette continued to contribute to the fund at the level called for by the CBA. The labor board, or the union, filed a charge. That ended up going all the way to the labor board. A unanimous decision comes down from the Board that says, no, the Post-Gazette was not contractually or statutorily required to pay any more than was called for under the CBA. So when they say we should have been paying more, that predated the arbitration, and the arbitration said that you have to pay for all of the increases. It did, Your Honor, but between 2017 and 2020, we were paying in compliance with what they told us was acceptable based on the Board order. Any questions? No, thanks. Your Honor, this Court has already rejected the argument that rescind doesn't mean restore. That was the argument they made in their motion for clarification of the injunction order. This Court denied that motion. They say they attempted to bargain over the terms of the new healthcare plan to be restored, but this Court's order doesn't require them to be bargaining over healthcare. It says that they have to rescind the changes to the terms and conditions regarding healthcare. Yes, they sent a letter to the Fund asking for information about the high-deductible plan, but asking for information about the wrong plan is not compliance with this Court's injunction order. The test for the impossibility defense is it must be a physical impossibility beyond the contemnor's control. That's FTC. The Lane Labs, we cited in our reply, this is not an argument that it is physically impossible. It's that they don't want to do it or that it would be expensive for them to do it, but that doesn't get them an impossibility defense. They didn't argue in their filings to this Court that, Judge Jung, your point about whether it'd be impossible for them to afford the existing healthcare fund, and not to get back to the earlier case, but in bargaining, they also didn't claim an inability to pay when they were talking about their proposals. This is the first time I'm hearing about a constitutional argument, so I don't think that should be, ought to be addressed. The Board did issue a decision involving the premium payments, yeah, the premium payments that the Post-Gazette should make. The Post-Gazette raised that in the litigation of the arbitration. They say these two things are inconsistent. That argument was rejected by the District Court, so they can't, you know, that litigation is over now. They can't use this case to relitigate that case. And again, this, we have to remember that this is in the contempt context, so the question is compliance with this Court's order. It is not the Board coming in and imposing a certain term of employment, term and condition of employment like in HK Porter. It's whether they have complied with this Court's order, and we ask that you ensure that they do. Can we see counsel at the sidebar off the record?